This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} In appellate case number 01CA0047, Appellant, Darla Jarvis ("Jarvis"), appeals from the judgment of the Wayne County Court of Common Pleas, which granted the motion for summary judgment of Appellees, the Gerstenslager Company ("Gerstenslager") and Worthington Industries, Inc. ("Worthington"), in trial court case number 01-CV-0187. In appellate case number 01CA0048, Appellant, Timothy Evans ("Evans"), appeals from the judgment of the Wayne County Court of Common Pleas, which granted the motion for summary judgment of Appellees in trial court case number 01-CV-0188. We affirm both judgments.
 I. {¶ 2} Jarvis and Evans ("Appellants") were employed by Gerstenslager, the parent company of which is Worthington. Jarvis began her employment with Gerstenslager on May 26, 1998; Evans began his employment on January 26, 1998. In October, 1998, the two began dating.
 {¶ 3} Jarvis contends that she was subjected to harassment by Dale Massie ("Massie"), a supervisor, and by co-workers, including Sam Rakich ("Rakich") and Keith McGraw ("McGraw"). Appellants reported the harassment by Massie and Rakich to Gerstenslager on May 8, 1999. Massie's employment was ultimately terminated, and Rakich was disciplined. Appellants and Gerstenslager came to an agreement, whereby the company would not fire Rakich, but that Rakich would not be permitted to have contact with Appellants.
 {¶ 4} Appellants claim that after the company told them that Rakich would be kept away from them, Rakich was assigned to work in the same area as Appellants. Appellants also claim that they observed Rakich in and around the area in which Appellants worked on various occasions. Appellants also claim that they were harassed in the workplace by co-workers after they reported Massie and Rakich's harassment to Gerstenslager.
 {¶ 5} Appellants worked third shift, with hours of 11:00 p.m. until 7:00 a.m. On the night of January 10, 2000, Appellants arrived at work and observed Rakich in the building in which they had been assigned to work that night. Although Rakich did not say anything to Appellants or otherwise harass them in any way, Appellants left the premises and did not work that shift. Appellants called in sick on the night of January 11. On the afternoon of January 12, 2000, Appellants requested transfers to second shift. That day, Appellants met with Alfred Zarella, Gerstenslager's security/safety manager. Zarella informed Appellants that if they wished to transfer to second shift, they would need to fill out transfer requests, which would be processed in accordance with the union's collective bargaining agreement. Zarella told Appellants that in order for them to be transferred, they needed to report to work until the transfer requests had been processed.
 {¶ 6} Zarella informed Appellants that if they did not return to work that evening, the company would consider their actions to be resignations. Zarella gave them copies of letters sent by the company via certified mail that repeated the company's position.
 {¶ 7} Appellants did not return to work. Both Evans and Jarvis obtained off-work slips from physicians; Jarvis' slip, which was dated on January 13, 2000 and stated that she was unable to work for the period of January 11 until January 31, 2000, was signed by Dr. Robert Lindsay of Community Family Healthcare of Orrville; Evans obtained his excuse, also dated January 13, from the Wooster Clinic. Evans' slip stated that he was unable to work from January 11 until January 21. Appellants provided these excuses to Gerstenslager on January 14, 2000. Appellants were terminated.
 {¶ 8} On May 7, 2001, Jarvis filed a complaint against Appellees, seeking declaratory, injunctive, and equitable relief, as well as damages, for sex-based hostile work environment, retaliatory hostile work environment, and retaliatory discharge, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); noncompliance and interference with her rights under the Family and Medical Leave Act ("FMLA"); infliction of emotional distress; and negligent supervision. On May 7, 2001, Evans filed his complaint against Appellees, for retaliatory discharge and retaliatory hostile work environment, in violation of Title VII; noncompliance and interference with the FMLA; infliction of emotional distress; and negligent supervision.
 {¶ 9} On April 1, 2002, Appellees filed motions for summary judgment in each case. Appellants filed briefs in opposition in their respective cases. Each party also filed supplemental briefs. On August 22, 2002, the trial court granted Appellees' motions for summary judgment in both cases.
 {¶ 10} Both Evans and Jarvis appealed, and the cases were consolidated on appeal. Jarvis raises six assignments of error, and Evans raises five. We will address some of the assignments of error together, as the relevant facts concerning the claims of Appellants are interrelated.
 II. Standard of Review {¶ 11} We begin our analysis by noting the appropriate standard of review. An appellate court reviews an award of summary judgment de novo.Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105. We apply the same standard as the trial court, viewing the facts in the case in the light most favorable to the non-moving party and resolving any doubt in favor of the non-moving party. Viock v. Stowe-Woodward Co. (1983),13 Ohio App.3d 7, 12.
 {¶ 12} Pursuant to Civil Rule 56(C), summary judgment is proper if:
 "(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." Temple v. Wean United, Inc.
(1977), 50 Ohio St.2d 317, 327.
 {¶ 13} To prevail on a motion for summary judgment, the party moving for summary judgment must be able to point to evidentiary materials that show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Dresher v. Burt (1996), 75 Ohio St.3d 280, 293. The non-moving party must then present evidence that some issue of material fact remains for the trial court to resolve. Id.
 {¶ 14} Where the non-moving party would have the burden of proving a number of elements in order to prevail at trial, the party moving for summary judgment may point to evidence that the non-moving party cannot possibly prevail on an essential element of the claim. See, e.g., Stivisonv. Goodyear Tire Rubber Co. (1997), 80 Ohio St.3d 498, 499. The moving party "bears the initial burden of demonstrating that there are no genuine issues of material fact concerning an essential element of the opponent's case." (Emphasis sic.) Dresher, 75 Ohio St.3d at 292. The burden then shifts to the non-moving party to show that there is a genuine issue of material fact as to that element. Id. at 293. "Mere reliance upon the pleadings is insufficient." Carr v. Nemer (Dec. 16, 1992), 9th Dist. No. 15575, at 2.
 Jarvis' First Assignment of Error "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY GRANTING [APPELLEES'] MOTION FOR SUMMARY JUDGMENT AS TO APPELLANT'S CLAIM FOR INTERFERENCE WITH HER RIGHTS UNDER THE FAMILY AND MEDICAL LEAVE ACT."
 Evans' First Assignment of Error "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO APPELLANT'S CLAIM FOR INTERFERENCE WITH HIS RIGHTS UNDER THE FAMILY AND MEDICAL LEAVE ACT."
 {¶ 15} In her first assignment of error, Jarvis challenges the trial court's grant of summary judgment to Appellees on her claims for interference with her rights under the FMLA. In his first assignment of error, Evans similarly challenges the grant of summary judgment on his claim for interference with FMLA rights. Each generally argues that there are genuine issues of material fact and that a reasonable jury could conclude they were entitled to leave under the FMLA and that Appellees wrongfully denied them leave.
 {¶ 16} The FMLA entitles an eligible employee to twelve work weeks of unpaid leave during any twelve-month period for a serous health condition that causes the employee to be unable to perform her job responsibilities and functions.[1] Section 2612(a)(1)(D), Title 29, U.S.Code; Ragsdale v. Wolverine World Wide, Inc. (2002), 535 U.S. 81,86, 152 L.Ed.2d 167. The FMLA prohibits an employer from interfering with, restraining, or denying an employee's exercise of the employee's rights under the act. Section 2615(a)(1), Title 29, U.S.Code. If an employer interferes with the employee's right to leave, the deprivation of the right is a violation of the FMLA, regardless of the employer's intent. Smith v. Diffee Ford-Lincoln-Mercury, Inc. (C.A.10, 2002),298 F.3d 955, 960. "When an employee alleges a deprivation of these substantive guarantees, the employee must demonstrate by a preponderance of the evidence only entitlement to the disputed leave. In such cases, the intent of the employer is immaterial." King v. Preferred TechnicalGroup (C.A.7, 1999), 166 F.3d 887, 891. Cavin v. Honda of Am. Mfg., Inc.
(S.D.Ohio Feb. 22, 2002), No. 02-00-400, 2002 U.S. Dist. LEXIS 19601.
 {¶ 17} In their motion for summary judgment, Appellees argued that Appellants were not entitled to FMLA leave because (1) neither Jarvis nor Evans was an employee at the time of their requests for leave under the FMLA; (2) they did not give reasonable notice of leave as required by the FMLA; and (3) they did not suffer from serious health conditions that made them unable to perform the functions of the their positions.
 {¶ 18} A plaintiff bringing suit under the FMLA has the burden of establishing the objective existence of a serious health condition. Bauerv. Varity Dayton-Walther Corp. (C.A.6, 1997), 118 F.3d 1109, 1112. A "serious health condition" is defined as:
 "an illness, injury, impairment, or physical or mental condition that involves — (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." Section 2611(11), Title 29, U.S.Code.
 {¶ 19} In the absence of specific statutory language, agency regulations "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Chevron U.S.A. Inc.v. Natural Resources Defense Counsel, Inc. (1984), 467 U.S. 837, 844,81 L.Ed.2d 694. The FMLA itself is silent as to the definition of "continuing treatment by a health care provider." Therefore, the regulations provide guidance in this area and cannot be said to be manifestly contrary to the statute. Moreover, we note that the parties in this matter rely upon the definition of continuing treatment contained in the regulations.
 {¶ 20} The federal regulations promulgated under the FMLA provide:
 "For purposes of the FMLA, `serious health condition' entitling an employee to FMLA leave means an illness, injury, impairment, or physical or mental condition that involves:
"(1) Inpatient care ***;
 "(2) Continuing treatment by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
 "(i) A period of incapacity (i.e. inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition that also involves:
 "(A) Treatment two or more times by a health care provider ***; or
 "(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider;
"***." Section 825.11.4(a), Title 29, C.F.R.[2]
 {¶ 21} Neither Jarvis nor Evans contends that the health condition involved inpatient treatment; therefore, they must show they were under the continuing treatment of a physician. Continuing treatment of a physician includes a period of incapacity of more than three consecutive days and either treatment on at least two occasions or treatment which results in a regimen of continuing treatment. Section 825.11.4(a)(2)(i), Title 29, C.F.R; Bond v. Abbott Laboratories (N.D.Ohio. 1998),7 F. Supp.2d 967, 973; Olsen v. Ohio Edison Co. (N.D.Ohio. 1997),979 F. Supp. 1159, 1164. A plaintiff "must first demonstrate that he suffered from a period of incapacity within the meaning of [the] regulation. Under the plain language of the statute and regulations, this is the threshold consideration.'" Olsen, 979 F. Supp. at at 1164. See, also, Bond, 7 F. Supp.2d at 973. "[I]t is only where an incapacity is shown that the Court need proceed to a consideration of whether the employee received `continuing treatment' within the meaning of the Act."Olsen, 979 F. Supp. at 1164-65. If a plaintiff cannot demonstrate an incapacity, summary judgment is appropriate. Id. at 1164-1165; Bond,7 F. Supp.2d at 973.
 {¶ 22} In support of Appellees' argument that Appellants did not have serious health conditions covered by the FMLA, Appellees submitted the deposition testimony of Jarvis, Evans, and Dr. Lindsay. Jarvis testified that when she met with Zarella on January 12, after two days off, she was able to work that day if the company would transfer her to second shift. Jarvis also stated that while she was home during this time, she performed work around the house. Evans similarly testified that during this time he cooked and cleaned and performed other work around the house. Evans also stated that when he met with Zarella on January 12, he would come back to work on second shift, although he stated that he "was under so much stress at that time [he] didn't know if [he] would make it back that night or not."
 {¶ 23} In their briefs in opposition to summary judgment, Appellants asserted that Appellees' motions for summary judgment should be denied because there were genuine issues of material fact concerning whether Appellants had serious health conditions. Appellants provided affidavits of health care providers from which they sought treatment on January 13 for stress-related problems. They argued that a reasonable jury could conclude that the doctor visits on January 13 demonstrated that the appellants were receiving "continuing treatment."
 {¶ 24} Jarvis' deposition testimony indicates that she was able to work. "The possibility that a person can work removes FMLA protection."Cole v. Sisters of Charity of the Incarnate Word (E.D.Tx., 1999),79 F. Supp.2d 668, 672, citing Murray v. Red Kap Industries, Inc.
(C.A.5, 1997), 124 F.3d 695, 699. Moreover, she performed other regular daily activities during her time off. Evans' deposition similarly reveals that he was able to return to work, although maybe not on January 12, and that he performed regular daily activities. Both Jarvis and Evans argued that their doctors prescribed medication and gave them off-work slips and that therefore, they satisfied the requirement of receiving continuing treatment. However, as Appellees pointed out both in their supplemental briefs to the trial court and in their brief to this Court, Appellants failed to address the requirement of incapacity. Thus, Appellants have failed to demonstrate genuine issues of material fact as to this requirement.
 {¶ 25} The evidence before the trial court reveals that Appellants did not have incapacities under the FMLA and, therefore, they did not have serious health conditions that would entitle them to leave under the Act. As Appellants were not entitled to leave under the FMLA, Appellees were entitled to judgment as a matter of law. Summary judgment was properly granted to Appellees on Appellants' claims for interference with their rights under the FMLA. As we have determined that summary judgment was appropriate on the basis that Appellants did not have severe health conditions, we decline to address the remaining arguments as to whether Appellants were eligible employees and whether they provided adequate notice under the FMLA. Jarvis' first assignment of error and Evans' first assignment of error are overruled.
 Jarvis' Second Assignment of Error "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY GRANTING APPELLEES' MOTION FOR SUMMARY JUDGMENT AS TO APPELLANT'S CLAIM FOR RETALIATION FOR HER EXERCISE OF HER RIGHTS UNDER THE FAMILY AND MEDICAL LEAVE ACT."
 Evans Second Assignment of Error "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO APPELLANT'S CLAIM FOR RETALIATION FOR HER (SIC) EXERCISE OF HIS RIGHTS UNDER THE FAMILY AND MEDICAL LEAVE ACT."
 {¶ 26} In their second assignments of error, Appellants challenge the grants of summary judgment on their claims for retaliation for exercise of their FMLA rights. In her complaint, Jarvis brought two causes of action under the FMLA: one labeled noncompliance with the act, in which she asserted that Appellees willfully failed to comply with the FMLA when they denied her leave, and one labeled interference, in which she asserted that Appellees violated her FMLA rights by willfully terminating her in order to deprive her of benefits. Evans similarly brought two causes of action under the FMLA: one for noncompliance, and one for interference. "Claims that an employer has improperly denied FMLA leave are more appropriately viewed as `interference' claims under29 U.S.C. § 2615(a)(1)." Cavin, supra.
 {¶ 27} A review of both Jarvis' and Evans' complaints and the respective records before the trial court reveals that neither of the appellants claimed that he or she was terminated in retaliation for taking leave under the FMLA; instead Appellants claimed that Appellees failed to comply with the FMLA and denied them leave by terminating them. Jarvis' and Evans' complaints did not recite a cause of action for retaliation based upon the exercise of their FMLA rights; accordingly, Jarvis' second assignment of error and Evans' second assignment of error are overruled.
 Jarvis' Third Assignment of Error "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO APPELLANT'S CLAIM FOR *** PERMITTING A SEX-BASED HOSTILE WORK ENVIRONMENT."
 {¶ 28} Jarvis' third assignment of error challenges the grant of summary judgment on her claim that she was subjected to a hostile work environment, in violation of Title VII.
 {¶ 29} Title VII prohibits an employer from discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." Faragher v. Boca Raton (1998),524 U.S. 775, 786, 141 L.Ed.2d 662; Section 2000e-2(a)(1), Title 42, U.S.Code. To establish a claim for hostile work environment, an employee must demonstrate: (1) he or she is a member of a protected class; (2) he or she was subjected to unwelcome harassment; (3) the harassment was based upon membership in the protected class; (4) the harassment created a hostile work environment; and (5) the existence of employer liability.Hafford v. Seidner (C.A.6, 1999), 183 F.3d 506, 512; Williams v. GeneralMotors Corp. (C.A.6, 1999), 187 F.3d 553, 560-561.
 {¶ 30} In their motion for summary judgment as to Jarvis' claim of hostile work environment, Appellees argued that Jarvis could not show the existence of employer liability for harassment by either a supervisor or by coworkers. They also argued that the conduct Jarvis complained of was not sufficiently severe or pervasive so as to affect the conditions of her employment.
 Harassment by a Supervisor {¶ 31} An employer is vicariously liable for a hostile work environment created by a supervisor. Faragher, 524 U.S. at 807. When no tangible employment action is taken, the employer may raise an affirmative defense by showing:
 "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing conduct, and (b) that the plaintiff employee unreasonable failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Id.
 {¶ 32} Jarvis initially reported the harassment by Rakich to Massie, who was her supervisor at that time. In her deposition, Jarvis stated that she did not have any problems with the company until after May 11, 1999, when she initially reported Rakich's harassment to Massie. She stated that she did not complain about Rakich's conduct prior to this. She admitted that management did not have any information about Rakich's conduct until she told them when she and Evans met with Zarella a few days later. It was at this meeting that Appellants also reported the harassment of Massie. After an investigation, Massie was fired, and Rakich was disciplined.
 {¶ 33} Jarvis also argued that Appellees could not demonstrate that they alleviated the hostile work environment. As a result of Jarvis' complaint of harassment by Massie, Massie was terminated. Jarvis does not contest this. She also admitted in her testimony that the first time she had any problems with Appellees was after she reported the harassment. Jarvis makes no claim concerning any other instance of harassment by a supervisor. As Appellees took prompt action to correct Massie's harassing conduct by terminating his employment, Jarvis cannot prevail on her claim of hostile work environment created by sexual harassment by a supervisor.
 Harassment by Co-workers {¶ 34} Jarvis also sought damages for harassment caused by co-workers Rakich and McGraw. "Employer liability for co-worker harassment is based directly on the employer's conduct." Hafford,183 F.3d at 513, citing Pierce v. Commonwealth Life Ins. Co. (C.A.6, 1994),40 F.3d 796, 804 n. 11. With respect to a hostile work environment caused by the harassment by co-workers, the employer company will be liable for damages caused by the sexual harassment by a co-worker if the company knew or should have known of the harassment and failed to implement prompt and appropriate corrective action. Id. at 513.
 {¶ 35} With respect to harassment by Rakich, Jarvis asserted that Appellees are liable because Rakich was often assigned to her work area. She further argued that Appellees failed to take prompt and appropriate corrective action. Jarvis complained to management about Rakich in May 1999, stating that he often stared at her or leaned up against her. After her complaint, Appellees agreed to keep Rakich away from her. Jarvis cited seven occasions when she saw Rakich between May 1999 and January 2000. The first time was on June 23, when Rakich was assigned to the same assembly line. She stated that on this occasion, Rakich stared at her; however, she did not complain to management, even though she saw many members of management, including Zarella, during this shift. On June 27, Jarvis was assigned to a different plant and came in contact with Rakich; Rakich did not harass her and she again did not complain to anyone. The next three occasions, when Jarvis discovered that Rakich would be assigned to her area, she complained to her supervisor, who then changed the assignments. Rakich did not work near Jarvis on these days, and he did not harass her in any way. The next occasion where Jarvis saw Rakich was on December 22, when she observed him entering the men's restroom near the break room. Again, Jarvis testified that Rakich did not speak to her, touch her, stare at her, or harass her in any way. Finally, on January 10, she saw that Rakich was in the same plant. She admitted that he did not harass her in any way on this day either; however, it was on this day that she and Evans left work.
 {¶ 36} Jarvis admitted that of these seven occasions, there was only one time Rakich stared at her or harassed her in anyway. She explained, "I don't believe he did anything because just that one time because they always moved him, I didn't want to be around him."
 {¶ 37} Jarvis' deposition reveals that each time she complained about Rakich working in the same area, management responded to her complaints by moving Rakich to another area of the plant. Jarvis admits that management took action in response to her complaints. As such, Appellees cannot be liable for harassment by Rakich.
 {¶ 38} With respect to Jarvis' claim that she was harassed by McGraw, Appellees argued that the conduct was not sufficiently severe and pervasive to affect the conditions of her employment and that Jarvis could not prove that management knew or should have known about it.
 {¶ 39} A hostile work environment occurs when the workplace is so "`permeated with discriminatory intimidation, ridicule, and insult' that is `sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harrisv. Forklift Systems, Inc. (1993), 510 U.S. 17, 21, 126 L.Ed.2d 295,114 S.Ct. 367, quoting Meritor Savings Bank, FSB v. Vinson (1986), 477 U.S. 57,91 L.Ed.2d 49. In determining whether a work environment is one that a reasonable person would find hostile or abusive, courts must consider the totality of the circumstances, including:
 "[T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23; see, also, Hafford, 183 F.3d at 512.
 {¶ 40} Title VII is not a "general civility code." Faragher,524 U.S. at 788. If the standards under Title VII are properly applied, "they will filter out complaints attacking `the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" Id., quoting B. Lindermann D. Kadue, Sexual Harassment in Employment Law 175 (1992).
 {¶ 41} Appellees cited to portions of Jarvis' deposition, where Jarvis described McGraw's conduct. The instances described relate to comments made by McGraw, with the exception of one event which took place between McGraw and another co-worker, Amy Clay, in which Jarvis explained that McGraw looked down Clay's shirt, looking for a lost cigarette lighter. Jarvis testified that McGraw and Clay were laughing as if they were making a joke, but that their comments were not made directly to her.
 {¶ 42} "`[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the `terms and conditions of employment.'" (Internal citations omitted.) Faragher, 524 U.S. at 788; see, also, Hafford,183 F.3d at 512-513. McGraw's occasional jokes and comments, some of which could be considered to be of a sexual nature, do not rise to the level where they changed the terms and conditions of Jarvis' employment. Instead, McGraw's actions fall under the category of "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" that Title VII was not meant to cover. SeeFaragher, at 524 U.S. at 788.
 {¶ 43} Based upon the foregoing, we conclude that Appellees were entitled to judgment as a matter of law on Jarvis' claim of hostile work environment because Jarvis could not demonstrate employer liability for harassment by Massie or Rakich, nor could she demonstrate that McGraw's conduct was sufficiently severe or pervasive to alter the conditions of her employment. Summary judgment was properly granted to Appellees on this claim. Jarvis' third assignment of error is overruled.
 Jarvis' Fourth Assignment of Error "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO APPELLANT'S CLAIM FOR A HOSTILE WORK ENVIRONMENT IN [RETALIATION] FOR HER HAVING OPPOSED DISCRIMINATORY PRACTICES."
 {¶ 44} Jarvis' fourth assignment of error challenges the grants of summary judgment on her claim for retaliatory hostile work environment in violation of Title VII.
 {¶ 45} In addition to prohibiting discrimination based upon gender, Title VII provides that an employer may not discriminate or retaliate against an employee who has opposed a practice made unlawful by Sections 2000e-2000e-17, Title 42, U.S. Code, or one who has made a charge, testified, assisted, or participated in an investigation, proceeding or hearing under these sections. Section 2000e-3, Title 42, U.S.Code.
 {¶ 46} To prove a prima facie case of retaliation under Title VII, a plaintiff must prove that:
 "(1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment." Morris v. Oldham Cty. Fiscal Court (C.A.6, 2000), 201 F.3d 784, 792.
 {¶ 47} In their motion for summary judgment on this claim, Appellees argued that Jarvis complained only of retaliatory harassment of co-workers and that she could not establish an adverse employment action.
 {¶ 48} An adverse employment action requires a materially adverse change in the terms and conditions of employment. Mast v. Imco Recyclingof Ohio, Inc. (C.A.6, 2003), 58 Fed. Appx. 116, 123. We discussed Jarvis' claims of a hostile work environment in detail in our discussion of her third assignment of error. We concluded that Jarvis could not establish the existence of a hostile work environment by the actions of co-workers, nor could she establish employer liability. Accordingly, her claim for retaliatory hostile work environment must fail as well. See, e.g., Mast, 58 Fed. Appx. at 123. Jarvis' fourth assignment of error is overruled.
 Evans' Third Assignment of Error "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO APPELLANT'S CLAIM FOR A HOSTILE WORK ENVIRONMENT IN [RETALIATION] FOR HIS HAVING OPPOSED DISCRIMINATORY PRACTICES."
 {¶ 49} In Evans' third assignment of error, he challenges the grant of summary judgment to Appellees on his claims for retaliation for the exercise of rights under Title VII.
 {¶ 50} As previously noted, to prevail on a claim for retaliation, a plaintiff must show that he engaged in a protected activity, known to the defendant, which caused the defendant to take adverse employment action against the plaintiff, or which caused severe or pervasive retaliatory harassment by a supervisor.
 {¶ 51} Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to show some legitimate, nondiscriminatory reason for its actions. Morris,201 F.3d at 792-793. The plaintiff then must demonstrate that the reason proffered by the employer was not the true reason for the employment decision. Id. at 793.
 {¶ 52} Evans claimed that he was retaliated against on two occasions: (1) by foreman Jane Leggett in June 1999, when Evans was verbally reprimanded; and (2) by foreman Terry Baer in October 1999, when Evans was suspended for ten days.
 {¶ 53} In June, Evans was reprimanded for "double hitting" a piece of machinery in a press. Evans explained that one piece of equipment got stuck on the line, and another piece of equipment came up behind the other and they got stuck together. Evans testified that the original discipline was to be a written warning, but Evans and his union steward got it reduced to a verbal reprimand.
 {¶ 54} In October, Evans was welding on a line that he claimed was moving too fast and that parts were backing up. He testified that he yelled at the foreman, Terry Baer, to "[t]urn that damn thing down[.]" When asked if he spoke in a calm voice, Evans replied, "I might have shouted. I told him to turn the MF'er down, turn it down now." Evans also stated that he may have thrown his gloves and face shield down. As a result of this incident, Evans was suspended for ten days. Evans also stated that after this incident, he had no further trouble with Baer.
 {¶ 55} Appellees demonstrated legitimate nondiscriminatory reasons for both of these instances of discipline in so far as showing that Evans was disciplined for workplace infractions. The burden thereafter shifted to Evans to demonstrate that the reasons given were not the true reasons for the actions. Evans argued that "[m]anagement routinely directs retaliatory action against those who oppose its practices. And there is evidence in addition to the observations of Plaintiff that there was a specific management intention to terminate Plaintiff's employment." In support of these assertions, Evans cited to affidavits of Ed Battig and Cindy Tope, Evans' co-workers. Battig stated several generalizations about Gerstenslager and concluded his affidavit by stating his belief that Gerstenslager management retaliated against Evans because he opposed the actions of Rakich and other employees. Battig did not allege knowledge as to management retaliation specifically related to these instances; his affidavit merely states his "belief." Tope's affidavit stated she overheard conversations between foremen at Gerstanslager, whereby the foremen discussed their intentions to terminate Appellants' employment. However, contrary to Evans' assertion, Tope did not allege that management's action were in retaliation.
 {¶ 56} Once Appellees demonstrated a legitimate nondiscriminatory reason for the actions taken against Evans, Evans had the burden of demonstrating that the reasons given were not the true reasons. Evans provided only the affidavits of Battig and Tope, neither of which provided evidence that the reasons given by Gerstenslager were not the true reasons. Accordingly, summary judgment was properly granted to Appellees on Evans' claims of retaliation.
 {¶ 57} Evans' third assignment of error is overruled.
 Jarvis' Fifth Assignment of Error "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO APPELLANT'S CLAIM FOR DISCHARGING PLAINTIFF IN [RETALIATION] FOR HER HAVING OPPOSED DISCRIMINATORY PRACTICES."
 Evans' Fourth Assignment of Error "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO APPELLANT'S CLAIM FOR *** DISCHARGING HIM IN [RETALIATION] FOR HIS HAVING OPPOSED DISCRIMINATORY PRACTICES."
 {¶ 58} Jarvis' fifth assignment of error and Evans' fourth assignment of error challenge the grant of summary judgment to Appellees on their claims for retaliatory discharge.
 {¶ 59} Appellees argued in their motions for summary judgment on Appellants' claims of retaliatory discharge that the company had shown a legitimate, nondiscriminatory basis for the termination of Appellants, and Appellants could not demonstrate that this was not the true reason for the termination.
 {¶ 60} The deposition transcripts reveal that Appellants left Gerstenslager on the night of January 10, 2000, when Appellants arrived at work and observed Rakich in the building in which they had been assigned to work. Appellants called in sick the next evening. On the afternoon of January 12, 2000, Appellants met with Zarella and discussed the possibility of being transferred to positions on second shift. Zarella informed Appellants at this meeting that if they wished to transfer, they would need to report to work until the transfer requests had been processed. Zarella also informed Appellants that if they did not return to work that evening, the company would consider their actions to be resignations. Appellants did not return to work and were terminated for refusing job assignments and/or refusal of job assignments and failing to report to work after being informed that the company would consider their actions to be resignations.
 {¶ 61} In opposition to summary judgment, Appellants provided affidavits of Tope and Battig. Battig's affidavit described his prior experience with Gerstengslager as a union steward. Battig stated that in this capacity, he discovered that "management would retaliate against individuals who challenged management practices, including those participating in the grievance process." Battig concluded that "[b]ased upon my observations and knowledge of the practices of Gerstensalgers [sic] management, I believe that Gerstenslagers [sic] had retaliated against Tim and Darla because they had opposed the actions of Rakich and other company employees."
 {¶ 62} Tope's affidavit stated that during her employment she "became aware of the desire of management to terminate the employment of Tim and Darla and also of the reluctance of Tim and Darla's co-workers to associate with them out of fear of retaliation by management against them for associating with Tim and Darla." Tope further stated that she overheard several conversations between supervisors and foremen discussing intentions to terminate Tim and Darla.
 {¶ 63} As we noted in the discussion of Evan's third assignment of error, these affidavits do not provide any evidence of retaliatory motive on behalf of Appellees. Tope's statement that she overheard conversations in which supervisors indicated a desire to terminate Appellants' employment does not state that the termination was in retaliation. Battig's affidavit similarly does not provide proof of retaliatory intent.
 {¶ 64} Once Appellees provided a legitimate, nondiscriminatory basis for the termination, the burden was on Appellants to show that this was not the true basis. Appellants failed to meet this burden with the affidavits provided. Accordingly, summary judgment was properly granted to Appellees on Appellants' claims for retaliatory discharge.
 {¶ 65} Jarvis' fifth assignment of error and Evans' fourth assignment of error are overruled.
 Jarvis' Sixth Assignment of Error "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO APPELLANT'S CLAIM FOR *** INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS."
 Evans' Fifth Assignment of Error "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO APPELLANT'S CLAIMS FOR *** INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS."
 {¶ 66} In Jarvis' sixth and Evans' fifth assignments of error, Appellants challenge the grant of summary judgment on their claim for the intentional infliction of emotional distress.
 {¶ 67} To prevail on a claim for the intentional infliction of emotional distress, a plaintiff must prove:
 "1) that [defendant] either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the [defendant's] conduct was so extreme and outrageous as to go `beyond all possible bounds of decency' and was such that it can be considered as `utterly intolerable in a civilized community'; 3) that the [defendant's] actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that `no reasonable man could be expected to endure it.'" (Internal citations omitted.) Pyle v. Pyle (1983), 11 Ohio App.3d 31, 34. See, also, Phung v. Waste Mgt. (1994), 71 Ohio St.3d 408, 410.
 {¶ 68} In Yeager v. Local Union 20, the Supreme Court of Ohio emphasized that "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are insufficient to give rise to a claim of intentional infliction of emotional distress. Yeager v. LocalUnion 20 (1983), 6 Ohio St.3d 369, 375, quoting Restatement of the Law 2d, Torts (1965) 73, Section 46, comment d. Instead, the defendant's conduct must be:
 "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, `Outrageous!'" Id., quoting Restatement of the Law 2d, Torts (1965) 73, Section 46, comment d.
 {¶ 69} The plaintiff must also show severe emotional distress.Id. at 374. Severe emotional distress goes beyond trifling mental disturbance, mere upset or hurt feelings. Paugh v. Hanks (1983),6 Ohio St.3d 72, 78. Severe emotional distress describes emotional injury that is both severe and debilitating, causing a reasonable person, normally constituted, to be unable to cope adequately with the mental distress engendered by the circumstances of the case. Id. at paragraph 3a of the syllabus. As a preliminary matter, the court must make the threshold "outrageousness" determination as a matter of law. Binns v.Fredendall (1987), 32 Ohio St.3d 244, 245, n. 1.
 {¶ 70} In their motions for summary judgment, Appellees argued that Appellants could not prevail on their assertion that the appellees' conduct was extreme or outrageous. Appellees pointed to portions of deposition testimony of Jarvis and Evans that detail the amount of contact they had with Rakich after they initially reported the sexual harassment. We have already discussed the contact with Rakich in detail in our discussion of Jarvis' third assignment of error; therefore, we will not repeat the evidence here.
 {¶ 71} It is clear from the depositions of both Jarvis and Evans that each time they complained, management responded to their complaints by moving Rakich to another area of the plant. Thus, Appellants themselves admit that management took action in response to their complaints. Such conduct cannot be considered extreme and outrageous and "beyond all possible bounds of decency" and "utterly intolerable in a civilized community." Summary judgment was therefore properly granted to Appellees on Jarvis' and Evans' claims of intentional infliction of emotional distress. Jarvis' sixth assignment of error and Evans' fifth assignment of error are overruled.
 III. {¶ 72} Jarvis' assignments of error are overruled. Evans' assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas in Jarvis v. Gerstenslager, trial court case number 01-CV-0187, is affirmed. The judgment of the Wayne County Court of Common Pleas in Evans v. Gerstenslager, trial court case number 01-CV-0188, is affirmed.
SLABY, P.J. and BATCHELDER, J. CONCUR.
[1] Although not relevant to this appeal, the FMLA also provides leave due to the birth or adoption of a child or in order to care for a spouse, child, or parent of the employee if the relative suffers from a serious health condition. See Sections 2612(a)(1)(A), (B), and (C), Title 29, U.S.Code.
[2] Continuing treatment of a health care provider also includes any period of incapacity due to pregnancy, any period of incapacity or treatment for such incapacity due to a chronic serious health condition, a period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective, and any period of absence to receive multiple treatments for restorative surgery after injury, or for a condition likely to result in a period of incapacity in the absence of medical intervention or treatment, such as cancer, severe arthritis, or kidney disease. Section 825.11.4(a)(2), Title 29, C.F.R. Appellants do not contend that they had any of these types of conditions.